UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS

| | | |
|---|---|---|
| JOSHUA CARPENTER, | : | Case No. 2:23-cv-425 |
| Petitioner, | : | |
| vs. | : | Judge Sarah D. Morrison |
| | : | Magistrate Judge Elizabeth P. Deavers |
| WARDEN, CHILLICOTHE CORRECTIONAL INSTITUTION | : | |
| Respondent. | : | |

## REPORT AND RECOMMENDATIONS

Joshua A. Carpenter,[1] a state prisoner proceeding with counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court to consider the Petition (ECF No. 1), the Return of Writ (ECF No. 5), Carpenter's Reply (ECF No. 6), and the state court record. (ECF Nos. 4, 4-1, 4-2, 4-2, 4-3, 4-4, 4-5). For the reasons that follow, it is **RECOMMENDED** that the Petition be **DENIED** and this action **DISMISSED WITH PREJUDICE**.

I.     FACTUAL BACKGROUND

On July 19, 2018, a Monroe County, Ohio grand jury indicted Carpenter on three counts of rape of A.C., who was between five and nine years of age, and three counts of rape of G.B., who was between five and nine years of age. (ECF No. 4 at PAGEID# 26-28). The indictment included a "sexually violent predator" specification. *Id.* Carpenter was tried by a jury April 4-5,

---

[1] Carpenter's legal name is "Brittany Leanna Carpenter." (ECF No. 4-4 at PageID# 1303-1304). Carpenter testified at trial that he transitioned back to a man and preferred to be referred to as Joshua Carpenter. (*Id.*). Carpenter's counsel utilizes male pronouns when referencing his client in brief. *See* ECF No. 6. For these reasons, the Court will refer to the Petitioner as "Carpenter" and will use male pronouns where required.

2019. The Seventh District Court of Appeals ("Court of Appeals") found that the following facts were adduced at trial:

> [Carpenter] is married to Tabitha. They have a daughter together, A.C., who was born in 2004. When A.C. was four years old, [Carpenter] began a relationship with Charlotte. [Carpenter] left Tabitha and moved in with Charlotte and her daughter G.B., who was born in 2009. [Carpenter] and Charlotte had a son together in 2011.
>
> A.C. had regular weekend and summer visitation with [Carpenter] at Charlotte's house. A.C. last visited with [Carpenter] at Charlotte's house in February 2016. In late 2016, when she was in the sixth grade, A.C. disclosed to her school guidance counselor that [Carpenter] had been sexually abusing her since she was five years old.
>
> [Carpenter] broke up with Charlotte and moved in with his new girlfriend, Gina in 2016. G.B. and her brother visited [Carpenter] at Gina's house on a few occasions. After a visit in 2016, G.B. returned home to Charlotte with a gash on her side and bruises on her rib cage. G.B.'s brother reported to Charlotte that [Carpenter] had whipped G.B. Charlotte did not allow her children any further visitation with [Carpenter] after that point. G.B. later disclosed to Charlotte's girlfriend that [Carpenter] had sexually abused her…
>
> A.C. testified that [Carpenter] began sexually abusing her after he and her mother (Tabitha) split up and [Carpenter] moved in with his girlfriend (Charlotte). She was five years old at the time and about to start kindergarten. She described the first time the abuse occurred. A.C. testified that they were sitting on the bed watching the movie "IT" while Charlotte was grocery shopping. [Carpenter] removed her pants and his own pants. A.C. stated that [Carpenter] then vaginally raped her. She stated that it "hurt incredibly awful" and she asked him to stop but he did not. When it was over, [Carpenter] told A.C. not to tell anyone.
>
> A.C. went on to testify that [Carpenter] repeatedly raped her whenever she visited him. The abuse included vaginal and anal rape in addition to oral sex. A.C. testified she never told her mother about the abuse because she was scared. She stated that she obeyed [Carpenter] because he was her dad. A.C. testified that the last time [Carpenter] raped her was on February 14, 2016, when she was 11 years old. She remembered this day because it was the last time she visited [Carpenter] at Charlotte's house.

A.C. also testified that when she was ten years old, her mother had her see a counselor because she was cutting herself. A.C. stated that close to Christmas 2016, she finally disclosed to her school counselor that [Carpenter] had been raping her. She stated she was going to have to visit [Carpenter] over Christmas break and she was trying to put a stop to the abuse.

A.C. additionally testified about [Carpenter] being transgender. She stated that she grew up with [Carpenter] being "trans" and that she loved him regardless of the fact that he wanted her to call him "Mom" or "Brittany."

A.C.'s mother, Tabitha, testified that after she and [Carpenter] broke up, A.C. visited with [Carpenter] every other weekend. A.C.'s visits with [Carpenter] continued until third or fourth grade. Tabitha noticed marks on A.C.'s arms and came to learn from A.C. that she was cutting herself. Tabitha also noticed that A.C. did not want to go to visit [Carpenter]. Tabitha took A.C. to counseling to deal with the cutting.

Tabitha stated that in December 2016, she received a call from the school counselor. She went to A.C.'s school and A.C. then disclosed to her that [Carpenter] had been raping her. She stated that thereafter she took A.C. for interviews and a checkup. Tabitha also stated that after her disclosure, A.C. learned [Carpenter] had been abusing G.B. too. She testified that A.C. blamed herself and thought that if she would have come forward sooner, she would have been able to spare G.B. from [Carpenter]'s abuse.

A.C.'s school counselor testified that on December 22, 2016, A.C. disclosed to her that [Carpenter] had been raping her since she was five. The counselor stated that A.C. was shaking and in tears and also confided that she was having suicidal thoughts. The counselor immediately contacted children's services and Tabitha. She stated that Tabitha came right away and A.C. then disclosed to her what [Carpenter] had done.

Retired Police Chief Chuck Hamilton investigated this matter. He interviewed [Carpenter]. Chief Hamilton informed [Carpenter] of the allegations A.C. had made. He asked [Carpenter] if he believed A.C. to be a truthful person. [Carpenter] responded that she was. At no point did [Carpenter] call A.C. a liar. Chief Hamilton also spoke with A.C. She told the chief that [Carpenter] placed his penis in her vagina and that he did so whenever she visited him. She indicated that the last time this happened was in February 2016.

Megan Dahlheimer is the pediatric nurse practitioner who examined A.C. Dahlheimer testified that it is very common for children to not report sexual abuse immediately. She stated that A.C.'s physical examination was normal, which is very common in a sexual abuse case. This is due in part because A.C.'s exam did not take place until almost a year after the last disclosed incident of abuse. Dahlheimer also stated that Tabitha had informed her that A.C. began menstruating at age seven. Dahlheimer testified that early onset of menstruation can be a sign of sexual abuse. Additionally, she stated that cutting is a red flag for abuse as is suicidal ideation, which A.C. disclosed to her. At the conclusion of her exam, Dahlheimer's diagnosis was consistent for child sexual abuse.

G.B. was nine when she testified. She testified that [Carpenter] touched her in a place he was not supposed to touch her. G.B. stated that it happened when her mom was at work. She said this occurred when she was in the first or second grade. She stated that this would occur on the couch in the living room. G.B. then elaborated and testified that [Carpenter] touched her "pee-pee" with his hands. She stated that she told him not to do that because her mom would get really mad but that he did it anyway. [Carpenter] then told G.B. not to tell her mom. She also testified that [Carpenter] put his mouth on her "pee-pee." G.B. stated that [Carpenter] also did these thing[s] when she visited him (after he had moved out of Charlotte's house). She then finally disclosed to Jamie (her mom's friend) and Charlotte (her mom) what [Carpenter] had been doing to her. G.B. also testified that she "didn't even know [A.C.] was involved in this" until she heard her mom talking on the phone about the night before the trial.

G.B. also testified that she had a scar on her side from [Carpenter] hitting her with a belt. And she testified that [Carpenter] would lock her in the basement.

Charlotte testified that she began a relationship with [Carpenter] in 2010, when G.B. was a year old. [Carpenter] moved in with her and the two had a son together in 2011. Charlotte stated that A.C. came and stayed with them every other weekend from the time she was five. She testified that [Carpenter] would care for the children while she was at work.

After she and [Carpenter] broke up and [Carpenter] moved out, Charlotte's girlfriend Jamie moved in with her. Charlotte testified that Jamie called her at work to tell her that G.B. had disclosed to her that [Carpenter] had been abusing her. Charlotte then asked G.B. what had happened and G.B. disclosed the abuse to her. Charlotte filed a police report. Charlotte stated that at the time G.B. disclosed to her what [Carpenter] had done she did not know about A.C.'s disclosure. She also

4

> testified that G.B. developed a problem with bedwetting when she was approximately four years old, which got better after her disclosure.
>
> Charlotte additionally testified regarding State's Exhibit 2, a photograph of [Carpenter] naked. She stated that the photograph was an accurate depiction of [Carpenter] while he was taking hormones. She stated that [Carpenter] was taking hormones throughout the time they were living together.
>
> Scott Steele is a child forensic interviewer at Harmony House Children's Advocacy Center. He interviewed G.B. She was seven at the time of the interview. The interview was played for the jury. Steele testified that G.B. was uncomfortable describing what [Carpenter] did to her. She was willing to circle areas on a picture of where [Carpenter] touched her. G.B. circled the genital area and the buttocks area. And when Steele asked her what [Carpenter] used to touch her private area, G.B. circled the mouth on the picture. She then indicated that [Carpenter] used his hand to touch her buttocks.
>
> Lauren Brown is another forensic interviewer who interviewed G.B. The video of her interview with G.B. was also played for the jury. During the interview, G.B. disclosed that [Carpenter] put his mouth on her vagina and put his finger on her vagina. Brown also prepared and submitted a report describing her findings.

(*Id.* at PageID# 402-407).

On April 5, 2019, the jury found Carpenter guilty on all 6 counts of rape. (ECF No. 4-4, at PageID# 1551-1553). The following day the jury heard additional testimony and found Carpenter to be a sexually violent predator. (ECF No. 4-5, at PageID# 1615). The trial court sentenced Carpenter to a mandatory term of life imprisonment without the possibility of parole. (*Id.* at PageID# 1625). The sentence also required Carpenter to register as a Tier III sex offender. (*Id.* at 1626).

II.     PROCEDURAL HISTORY

On May 2, 2019, Carpenter filed a notice of appeal to the Court of Appeals. (ECF No. 4 at PageID# 47-55). Carpenter's brief raised three assignments of error:

5

> (1) The trial court erred when it allowed a biased juror to sit on Mr. Carpenter's jury. R.C. 2313.17(8)(9); Sixth and Fourteenth Amendments, United States Constitution.
>
> (2) The trial court erred when it allowed expert testimony from a State's witness who was not first qualified as an expert, and who did not prepare a report at all, let alone provide one to the defense in discovery. Evid.R. 10.i and 702; Crim.R. 16(K).
>
> (3) Joshua Carpenter was denied the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Sixth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

(*Id.* at PageID# 59).

On November 6, 2020, the Court of Appeals issued a decision affirming the conviction and sentence. (*Id.* at PageID #152-171). Carpenter filed a notice of appeal with Supreme Court of Ohio and a memorandum in support of jurisdiction (*Id.* at PageID# 173-209). On March 2, 2021, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID# 211).

In the meantime, on October 13, 2020, Carpenter filed a petition for postconviction relief with the Monroe County Court of Common Pleas. (*Id.* at PageID# 213-251). Carpenter asserted four claims:

> (1) Trial counsel failed to object to inadequate expert reports that the State's experts relied upon, violating Mr. Carpenter's rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
>
> (2) Trial counsel failed to object to the State's experts testifying at trial despite the fact that they failed to produce reports required by Crim.R. 16(K), violating Mr. Carpenter's rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
>
> (3) Mr. Carpenter's convictions and sentence are void and/or voidable because he was denied the effective assistance of counsel at his trial when counsel failed, during the cross-examination of Woodsfield Police Chief Chuck Hamilton, to use the recorded interview of Mr. Carpenter by Chief Hamilton, which contradicted Chief Hamilton's trial testimony that Mr. Carpenter did not state that AI.C. was lying.
>
> (4) Mr. Carpenter's convictions and sentence are void and/or voidable because he was denied the effective assistance of counsel at his trial when counsel failed,

> during the cross-examination of State's witnesses Amanda Scott and Pamela Spencer, to adduce evidence that AI.C.'s self-harming behavior could have been in response to the confirmed abuse inflicted upon her by Brandon Vincent.

The Monroe County Court of Common Pleas denied Carpenter's petition on April 19, 2021. (*Id.* at PageID# 282-300). The Court of Appeals affirmed the denial of Carpenter's petition (*Id.* at PageID# 401-424), and the Supreme Court of Ohio subsequently declined jurisdiction. (*Id.* at PageID# 467).

### III. FEDERAL HABEAS PROCEEDINGS

On January 26, 2023, Carpenter filed the instant federal habeas petition, raising the following claim for relief:

> **GROUND ONE**: Mr. Carpenter was deprived of his right to effective assistance of counsel at trial. Further, the Ohio courts unreasonably resolved Mr. Carpenter's ineffective-assistance claim.
>
> **Supporting Facts**: Trial counsel failed to object to expert testimony from Lauren Brown, Megan Dahlheimer, and Katherine Doughty that violated Ohio Crim. R 16(K) because they provided no reports in discovery, rendering their testimony subject to exclusion from trial; and counsel also failed to impeach a key witness, Police Chief Chuck Hamilton, with an audio recording that contradicted his testimony. Counsel's failures were not grounded in strategy, and had counsel not rendered deficient performance, there is a reasonable probability that the outcome of the trial counsel not rendered deficient performance, there is a reasonable probability that the outcome of the trial would have been different.

(ECF No. 1 at PageID# 5).

On March 28, 2023, Respondent filed a Return of Writ. (ECF No. 5). Respondent contends that Carpenter's claims lack merit because the Court of Appeals' dismissal of the postconviction petition was neither contrary to nor an unreasonable application of federal law. (*Id.* at PageID #1643-1654).

### IV. STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

7

Penalty Act of 1996 (AEDPA). The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA. . . imposes a highly deferential standard for evaluating state–court rulings and demands that state-court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained the meaning of the standards found in § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of

8

> the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495.

*Lang v. Bobby*, 889 F.3d 803, 810 (6th Cir. 2018).

Moreover, under § 2254(d)(2), a state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a state court's factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted). Moreover, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

V.     DISCUSSION

Carpenter contends that his trial counsel was ineffective in two ways: (1) for failing to object to the testimony of three state witnesses who failed to provide adequate expert disclosures pursuant to Ohio Crim. R. 16(K), and (2) for failing to adequately cross-examine state witness, Woodsville Police Chief Chuck Hamilton.

"In all criminal prosecutions," the Sixth Amendment affords "the accused. . . the right. . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective

9

assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010). With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689.

As to the second prong, the Supreme Court held: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome." *Id.* at 694.

Where an exhausted claim of ineffective assistance of trial counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). That is, "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether trial counsel was ineffective, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. The Supreme Court clarified the double deference that is due:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal citation omitted). A petitioner must show the state court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement." *Id.* at 103. Congress "meant" this standard to be "difficult to meet." *Id.* at 102.

### A. Expert Testimony

Carpenter asserts that his trial counsel should have objected to the testimony of Lauren Brown, a social worker who conducted the forensic interview of G.B. (ECF No. 4-2 at PageID# 1126-1164), Megan Dahlheimer, a pediatric nurse practitioner who conducted a physical exam of A.C. (ECF No. 4-3 at PageID# 1171-1218), and Katherine Doughty, a nurse practitioner who conducted a physical exam of G.B. (*Id.* at PageID# 1220-1255). Carpenter argues that his counsel was ineffective because the experts' testimony went far beyond the content of the materials that were provided to the defense before trial, provided an opinion on the ultimate issue for the jury, and was heavily relied upon by the prosecution in closing argument. (ECF No. 6 at PageID# 6-15, 18-21).

Before trial, the state provided defense counsel with a letter and C.V. from Lauren Brown. (ECF No. 4 at PageID# 232-237). The letter included what it described as "information about child abuse," with a narrative description of the emotional aspects of disclosure of child abuse, the process of disclosure, and how the relationship between an offender and a child impacts disclosure,

11

including threats and grooming. (*Id.* at PageID# 232-235). At trial, Brown testified that she conducted a videoed forensic interview of G.B., which was played for the jury. (ECF No. 4-2 at PageID# 1138-1139). Brown testified that G.B. disclosed that Carpenter put his mouth and fingers on her vagina. (*Id.* at PageID# 1140). Brown went on to provide opinion testimony on the dynamics of child abuse (*id.* at PageID# 1145), why children find it difficult to talk about child abuse (*id.* at PageID# 1146), her opinion that G.B. was not coached during her interview (*id.* at PageID# 1154), and the reasons for delayed disclosure of child abuse (*id.* at PageID# 1155-1156).

Before trial the state provided defense counsel with a letter and C.V. from Megan Dahlheimer. (ECF No. 4 at PageID# 228-231). The letter contained one sentence: "Through my education and training, it has been brought to my attention that sexual abuse may be linked to early pubertal onset in children." (*Id.* at PageID# 228). At trial, Dahlheimer testified that she conducted a forensic physical exam of A.C. on January 3, 2017. (ECF No. 4-3 at PageID# 1176-1180). Consistent with her disclosure, Dahlheimer testified that A.C. had early onset puberty, which was associated with sexual abuse in children. (*Id.* at PageID# 1191-1192). In addition to the factual findings of the exam, Dahlheimer offered testimony regarding the reasons for delayed disclosure of child abuse (*id.* at PageID# 1182-1183), why sexual abuse would result in a normal physical exam (*id.* at PageID# 1187-1190), "red flag" behaviors in a child that indicate sexual abuse, including self-harm and suicidal ideation (*id.* at PageID# 1193-1194), and how a child may be threatened and intimidated by an abuser (*id.* at PageID# 1199-1201).

The state provided defense counsel with a C.V. only from Katherine Doughty. (ECF No. 4 at PageID# 238-240). Doughty testified that she conducted a sexual assault exam on G.B. on August 17, 2017. (ECF No. 4-3 at PageID# 1222-1231). The defense stipulated that Doughty was an expert sexual assault nurse examiner. (*Id.* at PageID# 1232). After testifying that G.B.'s

12

physical exam was normal, Doughty offered opinion testimony on the reasons for delayed disclosure of child abuse, including dynamics between the abuser and the child and the impact of threats of harm. (*Id.* at PageID# 1239-1241).

As noted above, Carpenter raised this claim with the Ohio state courts in his postconviction petition. The Court of Appeals issued the last-reasoned decision on the claim, finding that it lacked merit. (ECF No. 4 at PageID# 401-424). The decision began by noting that violations of Ohio Crim. R. 16(K) are subject to harmless error review. (*Id.* at PageID# 413-416). The Court of Appeals then concluded that Brown's disclosure was "unorthodox" (*id.* at PageID# 416), but the defense was sufficiently on notice of the content of Brown's testimony and Carpenter could not demonstrate prejudice. (*Id.* at PageID# 416-417). With respect to Dahlheimer and Doughty, the Court of Appeals found that their disclosures violated Ohio Crim. R. 16(k), but "no prejudice resulted from the statutory violations, as the remaining testimony, particularly from the victims, was compelling and the outcome of the trial would not have changed had Dahlheimer and Doughty's testimony been foreclosed." (*Id.* at PageID# 418).

Carpenter cannot demonstrate that the Court of Appeals unreasonably applied *Strickland* to the facts of his case. Doughty and Dahlheimer's testimony strayed from their expert disclosures. However, it was not objectively unreasonable for the Court of Appeals to conclude that Carpenter was not prejudiced by his counsel's failure to object. The record contains detailed testimony from A.C. and G.B. describing the sexual abuse perpetrated by Carpenter (ECF No. 4-1 at PageID# 755-840; ECF No. 4-2 at PageID# 904-941). The record contains corroborating testimony from the adults to whom A.C. and G.B. disclosed the abuse, including the girls' mothers (ECF No. 4-1 at PageID# 860-894; ECF No. 4-2 at PageID# 1008-1056), a school counselor (ECF No. 4-2 at PageID# 942-959), police officers (ECF No. 4-1 at PageID# 842-858; ECF No. 4-2 at PageID#

13

1106-1124), and social workers (ECF No. 4-2 at PageID# 959-1005, 1058-1106). It also contains two video-taped forensic interviews of G.B. (ECF No. 4-2 at PageID# 1065, 1139). Given the inculpatory nature of other testimony offered at trial, the Court cannot say that it was objectively unreasonable for the Court of Appeals to conclude that Carpenter was not prejudiced because the outcome of the trial was not impacted by his counsel's failure to object to the experts' testimony.

(i)       Cross-Examination of Chief Hamilton

Next, Carpenter contends that his trial counsel was ineffective because he failed to adequately cross-examine Woodsfield Chief of Police, Chuck Hamilton. The state called Hamilton to testify on the second day of trial. (ECF No. 4-2 at PageID# 1106-1124). He was the lead investigator into the allegations against Carpenter and interviewed him on July 30, 2018. (*Id.* at PageID# 1108-1111). On direct examination Hamilton testified that Carpenter "stated that he believed that [A.C.] was a truthful person." (*Id*. at PageID# 1112). The prosecutor asked Hamilton, "At any juncture in your interaction with the Defendant, did he ever call [A.C.] a liar," to which he responded, "No." (*Id.* at PageID# 1116).

Carpenter took the stand in his own defense. (ECF No. 4-4 at 1289-1302). He testified that he was made aware of the allegations against him during the interview. (*Id.* at PageID# 1336-1337). He acknowledged that he said that A.C. was truthful (*id.* at PageID# 1337), but also said he told Hamilton, "If she's making these allegations, she must be making them up, because I never did them." (*Id.*).

Carpenter argues that his counsel was ineffective when he failed to confront Chief Hamilton with the audio recording of his interview during cross-examination. Carpenter contends that Hamilton's testimony that he said that A.C. was not a liar left the jury with the wrong impression because he also denied abusing A.C during the interview and those statements were

not mentioned during Chief Hamilton's direct examination. (ECF No. 6 at PageID# 1670-1671). Moreover, Carpenter argues, the state emphasized Chief Hamilton's misleading testimony in closing argument. (*Id.* at PageID# 1676).

The Court of Appeals rejected Carpenter's postconviction claim. (ECF No. 4 at PageID# 418-421). The Court of Appeals acknowledged that the recorded interview included the following interaction that went unheard by the jury:

> {44} When Chief Hamilton asked Appellant to suggest a motive for AC. to fabricate the allegations against him, Appellant speculated that A.C. may have resented him for "not [being] in the picture," and for being transgender. Appellant then conceded his own bewilderment at A.C.'s allegations, stating "I know I never messed around with any kid, period."
>
> {45} At the conclusion of the interview, Appellant stated, "This is all some crazy shit. Here I thought I was just talking child support. I know Jamie said some shit over the last couple years. I thought it was just Jamie being a bitch." When Chief Hamilton explained that the charges were "serious enough to incarcerate [Appellant] for the rest of [his] life," Appellant responded, "That's crazy for something I didn't even do." Appellant described his state of mind as "shocked" and "blown away." His final statement at the interview was "I know I didn't do nothing [sic] along those lines. I know I didn't do shit."

(*Id.* at PageID# 419-420). The Court of Appeals found that counsel could have confronted Chief Hamilton with the tape during cross-examination without running afoul of the hearsay rule, but Carpenter did not suffer any prejudice from his counsel's failure to do so. (*Id.* at PageID# 421). Specifically, "[Carpenter] testified at trial and his testimony regarding his protestations during the police interview were heard by the jury. Moreover, the remaining testimony offered during the trial provided substantial evidence of [Carpenter's] guilt." (*Id.*).

Carpenter also cannot meet the standard for federal habeas corpus relief for his claim that his counsel failed to adequately cross-examine Chief Hamilton. To the extent that the state's direct examination of Chief Hamilton left the jury with the impression that Carpenter did not deny the allegations of sexual abuse, it was misleading. However, as pointed out by the Court of Appeals,

any misunderstanding was mitigated by Carpenter's testimony about his statements during the police interview. In any event, as mentioned above, Carpenter cannot demonstrate that he was prejudiced by any deficient performance by his counsel because he cannot overcome the overwhelming evidence of guilt that was introduced by the state. For these reasons, the Court cannot say that it was objectively unreasonable for the Court of Appeals to dismiss Carpenter's claim that his counsel was ineffective for inadequately cross-examining Chief Hamilton.

VI.     CONCLUSION

Carpenter's ineffective assistance of counsel claims are without merit. It is therefore **RECOMMENDED** that the habeas petition be **DENIED,** and this action be **DISMISSED WITH PREJUDICE.**

For the foregoing reasons, the Undersigned **RECOMMENDS:**

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial

necessity.  See Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO ORDERED**.

April 18, 2024                                         *s/ Elizabeth A. Preston Deavers*
                                                       Elizabeth A. Preston Deavers
                                                       UNITED STATES MAGISTRATE JUDGE